Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,321-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JERRY G. WILLIAMS                           Appellant

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Claiborne, Louisiana
Trial Court No. 33,979

Honorable Walter Edward May, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By:  Edward Kelly Bauman

DANIEL W. NEWELL                       Counsel for Appellee
District Attorney

JAMES HENRY COLVIN, JR.
PERRIN NELSON SMITH, JR.
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and HUNTER, JJ.

**STONE, J.**

This criminal case arises from the Second Judicial District Court, the Honorable Walter May presiding. The defendant, Jerry Williams ("Williams"), pled guilty to manslaughter and was sentenced to 21 years of incarceration at hard labor. Williams now appeals his sentence as excessive.

## FACTS AND PROCEDURAL HISTORY

On March 2, 2022, Williams and Johnny Lee Gilbert (the "victim") were playing a card game and a heated disagreement ensued. Williams was overheard saying he would kill the victim. Afterward, they had a fist fight, which Williams admittedly lost. Shortly after the killing, police officers found Williams with a cut over his eye that had bled enough to stain his jacket. Williams—not accepting defeat—retrieved his pistol from his apartment, then entered the victim's apartment and shot him once in the leg and then fatally in the head.

Williams was initially indicted for second degree murder but made a plea deal for manslaughter, which left sentencing to the trial court. The following is the factual predicate the prosecution gave at the guilty plea hearing:

> Were this matter to proceed to trial, the State would prove with competent evidence that within the boundaries of Claiborne Parish, on March 2, 2022, the Defendant was -- encountered his -- the victim in this case, a Mr. Gilbert, Mr. Johnny Lee Gilbert of 361 Oil Mill Street in Homer, Louisiana. They were playing cards, apparently a verbal fight ensued between the two; the Defendant, Mr. Jerry Williams, was heard to say that he had -- he was going to kill, uh, the ultimate victim in this matter, Mr. Gilbert. Later that day, Mr. Gilbert goes to his home apartment there on Oil Mill Street and he encounters the Defendant coming out of his apartment home, and then a fistfight ensues there that was ultimately broken up by Lameka Harris; this was captured on video, this fight was. That matter has -- that video has already been admitted into

evidence at a motion in limine hearing previously held before the Court. Thereafter, after the fight is broken up, Mister -. the Defendant, Mr. Williams, goes to his home, which is a short walk -- a short distance away from Mr. Gilbert's address, and he retrieves a Hi-Point 9-millimeter and he takes that Hi-Point 9-millimeter, and he goes back to the house where Mr. Gilbert lives, enters into the dwelling, and shoots the victim; Johnny Lee Gilbert; twice, first in the leg and the second to the -- bullet wound to the head of the Defendant. Mr. Gilbert was pronounced dead on the scene; a gunshot wound was the cause of death as found by the coroner. Afterwards, Mr. Gilbert was -- excuse me, Mr. Williams goes next door and tells some neighbors next door that someone needs to go check on Mr. Gilbert; they did so, they found the dead body, Homer Police Department was called. Garrett Monroe with Louisiana State Police ultimately comes there, does the investigation, speaks to Mr. Williams, asks him where the gun was, Mr. Williams tells him where the gun is; that he had taken the gun after it was over with and hid it along a trail in between the victim's home and his home. Police find the gun exactly where it was said to have been, showing consciousness of guilt, he hid the murder weapon. A subsequent ballistic analysis did reveal that the gun that was hidden and where Mr. Williams directed police to find it, was in fact the gun used in the homicide, or the killing of Johnny Lee Gilbert. Mister -- or Detective Monroe of Louisiana State Police did question, after proper mirandizing of the Defendant, did question Mr. Williams, and Mr. Williams did admit during questioning that he did shoot and kill the victim, Johnny Lee Gilbert.

Williams reticently agreed to the factual basis, stipulating that it was accurate enough to support his guilty plea for manslaughter. Williams sought to reserve his chance to tell his side of the story and demonstrate his alleged remorse at sentencing.

After receiving the guilty plea, the trial court ordered a presentence investigative report ("PSI"). Therein, Williams is quoted stating that he had no choice but to shoot the victim because the victim was "beating the hell out of me" but did not mention the victim wielding a knife. In contrast, at sentencing, Williams testified:

> Well, he -- The incident happened like it was because we was real good friends and stuff; I'd go over to his house every day, he'd come to my house every day. And that day I happened to walk over there because that was my routine everyday thing, and I'd go over there and we'd walk and talk and go to the store and get beer and stuff, and that day I just happened to walk in the house and I asked him about a beer and I started walking out and I came out, he just started a fight with me, and that one kind of puzzled me. And then, uh, the little girl's name is Mika Champ, she pulled him off of me, and then I went home, and I said I wonder why he'd do that because we wasn't into it over nothing, not arguing, fighting, fussing, none of that stuff. And I was finn' to walk back over there, and I said I don't know what that boy might do, and that's when I turned around and went home and got that -- that little thing [gun], then I went and knocked on the door and I said, uh -- and he said, "Who is it?" I said, "It's me, Pee-wee," I called him
> Pee-wee. He said, "Come in," and when I walked in, he was sitting in the chair by
> the front door in the window. When I walked in there, he jumped up out the chair
> and had a long, some black handle knife in his hand. And he was coming towards
> me and I fired on -- I shot on the -- I shot on the floor, to kind of scare him.
> …
> Well, it [i.e., killing the victim] wasn't like intentional or nothing, not on my behalf. I [was] just trying to stop him from stabbing me.

As seen above, nothing in the factual basis for the *guilty* plea[1]–to which Williams agreed under oath—supports his claim that the victim was approaching menacingly with a knife. However, the prosecution admitted that the victim's dead body was found lying on top of a steak knife.

Williams's sentencing testimony *also* substantially contradicted the factual basis (for the guilty plea) regarding the events leading up to him killing the victim. At sentencing, Williams: (1) implicitly denied that there had been a card game or a disagreement over the card game or a fistfight

---

[1] I.e., not an *Alford* plea or plea of no contest.

3

over the card game; instead, he claimed that he "just happened to walk in the [victim's] house and ask about a beer and…he just started a fight with me, and that one kind of puzzled me." He further explained that someone pulled the victim off of Williams to break up the fight (which is consistent with Williams having lost the fight). (2) Then, he claimed that he went and got his gun as "protection" before he went back to the victim's house for the "innocent" purpose of merely understanding of why the victim had attacked him. The trial court had ample justification for regarding Williams's testimony as untruthful and for finding that Williams failed to show any remorse.

Particularly relevant to Williams's argument on appeal, *infra*, the PSI report shows that Williams had five DWI convictions over the course of his career as a chronic alcohol abuser: 1986 (DWI first); 1989 (DWI second); 2002 (DWI first); 2012 (DWI second); 2019 (DWI second). He was also convicted of aggravated battery with a dangerous weapon in 1991 and resisting arrest in connection with his 1986 DWI. Additionally, in 2013, Williams's probation (stemming from his 2012 DWI) was revoked. His record also includes the following arrests: (1) on January 14, 2007, he was arrested for simple criminal damage to property and resisting an officer; and (2) on March 2, 2007, he was arrested for resisting an officer; (3) on July 13, 2007, he was arrested (and formally charged September 4, 2007) for DWI and possession of an alcoholic beverage inside a motor vehicle.

The trial court, after reviewing the PSI report and hearing William's testimony, sentenced Williams to 21 years of incarceration at hard labor. In so doing, the court noted Williams's total lack of remorse. Williams filed a motion to reconsider sentence, which the trial court denied after allowing

Williams to testify that he was, in fact, remorseful. Williams stated that the victim was his "best friend," and he loved the victim's children as if they were his own nieces and nephews.

**ISSUE**

Williams now appeals his sentence as excessive. The appellate brief filed on Williams's behalf states, in effect, that he is an alcoholic but does not specifically claim he was intoxicated at the time he shot the victim.[2] In contrast, the PSI report indicates that Williams denied that he uses alcohol and that he claimed to have never had any counseling or treatment for substance abuse/dependence. Nonetheless, Williams's brief asserts that his potential for rehabilitation from alcoholism militates in favor of his claim of excessiveness. Williams also points out that he was 71 years old at the time of sentencing; and, thus, he will probably die before completing his sentence. Based on these premises, Williams claims his sentence is constitutionally excessive.

**DISCUSSION**

In *State v. Boswell*, 56,200 (La. App. 2 Cir. 4/9/25), we recently reiterated the law concerning excessive sentence claims:

> An excessive sentence claim is reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1 and whether the sentence is constitutionally excessive.
> Ordinarily, appellate review of sentences for excessiveness utilizes a two-prong process. However, when the motion to reconsider sentence raises only a claim of constitutional excessiveness, a defendant is relegated [under La. C. Cr. P. art. 881.1(E)] to review of the sentence on that ground alone.
> Boswell, by failing to state specific grounds for his motion to reconsider sentence, has waived his right to have his

---

[2] Nor is such indicated in the factual predicate for the guilty plea, the defendant's sentencing testimony, or the PSI report.

sentence reviewed for compliance with art. 894.1. As a result, the remaining question is whether his sentence exceeds the punishment allowed by the state and federal constitutions.

The Eighth Amendment of the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive.

The appellate court must determine if the sentence is constitutionally excessive. To assess a claim that a sentence violates La. Const. art. I, § 20, the appellate court must determine if the sentence is grossly disproportionate to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.

The sentencing court has wide discretion to impose a sentence within the statutory limits, and the sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. (Internal case citations omitted.)

Second degree murder includes the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. A person convicted of second degree murder is subject to a statutorily mandated life sentence without possibility probation, parole, or suspension of sentence. Manslaughter includes:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed

La. R.S. 14:31. "Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." La. R.S. 14:31(B).

6

The record demonstrates that the trial court adequately considered the guidelines and thoroughly articulated a factual basis for the sentence.

Williams's sentence is neither cruel nor unusual. His brief to this court in effect urges that his alcoholism should be given more weight in mitigation. We disagree. Williams's criminal career spanned approximately 41 years and, indeed, his five DWI convictions do clearly indicate his active alcoholism for over three decades. However, his failure to attain and maintain sobriety is nobody's fault but his own. If, *despite Williams's failure to make such an allegation*, intoxication *did* play a role in his pride-driven decision to commit homicide, it does not make his 21-year sentence unconstitutional, to say the least. That is especially so because, as shown by his five DWI convictions spanning approximately 33 years, Williams had ample time and abundant reason to get sober and stay sober—*before* his alcohol abuse clouded his judgment to the point of: (1) getting angry to the point of a fistfight with his best friend over a card game and threatening to kill him; (2) retrieving a gun from his home; (3) unlawfully entering the apartment of his best friend; and (4) shooting his best friend in the leg and then fatally in the head. There is no way Williams could *validly* claim that he did not know, before mortally wounding his best friend, that his continued drinking would lead him to make more bad decisions.

Furthermore, Williams denied even consuming alcohol in his PSI interview.[3] Yet Williams must have known then that he had five DWIs on his record and that the court would also know about his five DWIs. Williams's continued lack of veracity when he already knew that everyone

---

[3] In self-contradiction, Williams admitted drinking beer in his sentencing testimony.

concerned would easily ascertain that he was lying demonstrates that there was, and perhaps still is, a cosmic gulf between Williams's state of mind and any admission that he has a toxic relationship with alcohol.  Thus, Williams himself proved that, at the time he made that denial—he had no prospect of recovering without first receiving a colossal injection of honesty.

Williams's age does not make his 21-year sentence unconstitutional.  Apart from whatever one believes about the afterlife, the victim is dead, and his family will not see him again.  Twenty-one years in prison is a small price to pay for wantonly causing such immense harm.  Moreover, the facts to which Williams agreed under oath indicate he committed second degree murder, which a jury may *or may not* have found was committed in the heat of passion in response to legally adequate provocation under La. R.S. 14:31.  Williams got a plea deal that eliminated his substantial risk of a murder conviction, which is subject to a statutorily mandated life sentence (as opposed to the 40 year maximum for manslaughter).

Finally, we point out that the trial court was well justified in finding that Williams lacked remorse.  At sentencing, Williams, in effect, coldly denied any wrongdoing.  The trial court indicated that Williams's failure to show remorse was a substantial factor in deciding the sentence.  Only afterward, at reconsideration of that sentence, did Williams make a real effort to demonstrate remorse. Williams's words at that juncture rang hollow with the trial court just as they do with this court now.  Accordingly, the record easily supports the trial court's finding that Williams lacked remorse, as he remained committed to untruthfulness in order to escape the

8

consequences of killing his best friend.

## CONCLUSION

For the above reasons, Williams's conviction and sentence are

**AFFIRMED**.